**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
|     Plaintiff, | ) | |
| v. | ) | Case No. CR-12-297-R |
| | ) | |
| JERRY ROSS CAWOOD, | ) | |
| | ) | |
|     Defendants. | ) | |

**DEFENDANT CAWOOD'S SENTENCING MEMORANDUM
AND MOTION FOR DOWNWARD DEPARTURE/VARIANCE**

COMES NOW, Jerry Ross Cawood, (pronounced Kay-wood) defendant in the above styled and numbered cause, by and through his attorney of record, William H. Campbell, and presents to the Court his sentencing memorandum for use by the Court in determining an appropriate sentence in his case.

Sentencing Factors & Options

The Defendant presents, initially, the sentencing considerations of 18 U.S.C. §3553(a) for ease of reference by the Court.

> **§ 3553. Imposition of a sentence**
>
> **(a) Factors to be considered in imposing a sentence** -- The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider --
>
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed --

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for --

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines.

In the options category are the obvious: straight incarceration, probation, or a combination.

Also of consideration are the advisory Sentencing Guidelines. The consideration of the advisory Sentencing Guidelines is, of course, tempered by *Kimbrough v.United States*, 128 S.Ct. 558 2007, *Gall v.United States*, 552 U.S. 38 2007, *Rita v. United States*, 551 U.S. 338 (2007), *Spears v. United States*, 555 U. S. ____ (2009) and most recently *Alleyne v. United States*, (Slip Op. 11-9335, June 17, 2013).

Sentencing Methodology and Efficacy of the Guidelines

Because a finding that Mr. Cawood is a career criminal supersedes any other

finding in the Guidelines it is addressed *apriori.* Mr. Cawood, is currently computed as a Category VI, Level 29 for the offense charged and plea taken. This calculation includes a three level reduction for acceptance of responsibility. With the career offender enhancement the matter becomes a Level 34 with the same Category VI. This enhancement has a dramatic increase in the Guideline sentencing ranges raising a 151-188 months range to a 262-327 months range. The difference between the bottom ranges is 111 months or more than nine years. The difference between the top ranges is 139 months or eleven and one half years.

The minimum sentence for the offense to which Mr. Cawood has entered his plea of guilty is ten years or in Guideline terms 120 months. The pre-sentence report attempts by finding additional facts to more than double this minimum. In the recent decision of *Alleyne v. United States*, ___U.S.___ (Slip Op. June 16, 2013, p. 12) states:

> Elevating the low-end of a sentencing range heightens the loss of liberty associated with the crime: the defendant's "expected punishment has increased as a result of the narrowed range" and "the prosecution is empowered, by invoking the mandatory minimum, to require the judge to impose a higher punishment than he might wish."

If we are to maintain logical consistency in sentencing then it is clear the effect of imposing §4B1.1 and informing the court the minimum proper sentence under the Guidelines is double the minimum of the offense to which the plea was entered, is unsustainable. To say the prohibition only applies to a statutory mandatory minimum increase is to permit the continuation of the rejected practice by simply altering its nomination. While it is true the Guidelines are advisory, they are also given

substantial consideration. Where the Guidelines double a minimum punishment and the Probation Office states the Plea Agreement does not impact the guideline calculation, more inquiry is needed. While that impact statement is true, it is not complete. The guideline calculation not only impacts the Plea Agreement, it eviscerates its content and intent. In other words, it is the Plea Agreement which is impacted by the guideline calculation to such an extent that it is rendered a nullity in many respects. The real problem, however, is the guideline counsels a sentence which is clearly predicated on facts which violate the prohibitions of both *Apprendi v. New Jersey*, 530 U.S 466 (2000) and now *Alleyne.* It is worth noting that thirteen years later, and despite Circuits rulings attempting to limit its effect, the Supreme Court has not retreated one comma from its holding in *Apprendi*. Indeed, it has reaffirmed that case repeatedly.

Here we have a case with a ten year to life statutory range. But the Guideline would set a different, higher, minimum sentence. Under prior case law this might have been permitted but no longer. The *Alleyne* Court, in overruling it prior decision in *Harris v. United States*, 536 U.S. 545, stated [id. p. 13-14]:

> *Harris* relied on the fact that the 7-year minimum sentence could have been imposed with or without a judicial finding of brandishing, because the jury's finding already authorized a sentence of five years to life.
>
> . . .
>
> When a finding of fact alters the legally prescribed punishment so as to aggravate it, the fact necessarily forms a constituent part of a new

  offense and must be submitted to the jury. It is no answer to say that the defendant could have received the same sentence with or without that fact.

Since it is clear that the Guideline Chapter Four Career Offender enhancement seeks to set a new aggravated minimum sentence it must run afoul of the intent of the *Apprendi-Alleyne* line of cases. Just as the Supreme Court says it is no answer to say the defendant could have received the same sentence, is it likewise no answer to say the Guidelines are only advisory. Because advisory or not the attempt is to accomplish the same improper result. <u>See also</u>, *United States v. Sanchez*, 517 F.3d 651 (2d Cir. 2008) (a district court may vary on the basis of the career offender guideline because the statute creating the career offender designation is a direction to the Sentencing Commission, not the courts); *United States v. Corner*, 598 F.3d 411 (7th Cir. 2010) ("Because § 4B1.1 [the career offender guideline] is just a Guideline, judges are as free to disagree with it as they are with § 2D1.1(c) (which sets the crack/powder ratio). No judge is *required* to sentence at variance with a Guideline, but every judge is at liberty to do so."); *United States v. Vazquez*, 558 F.3d 1224 (11th Cir. 2009), *cert. granted, judgment vacated*, 130 S. Ct. 1135 (2010) (a district court may not vary on the basis of a disagreement with the career offender guideline because "the Supreme Court [in *Kimbrough*] expressly made a distinction between the Guidelines' disparate treatment of crack and powder cocaine offenses—where Congress did not direct the Sentencing Commission to create this disparity — and the Guideline's punishment of career offenders —which was

explicitly directed by Congress") [It is specifically noted the Supreme Court in *Vasquez* concluded the Circuit Court's decision stated reliance on *Kimbrough*'s reference to Section 994(h) also depends on the additional, unstated, premise that congressional directives to the Sentencing Commission are equally binding on sentencing courts. That premise is incorrect].

Alternatively, even if this Court believes the advisory nature is sufficient to distinguish it from the cited prohibitions, then the enhancement may still be viewed as yielding an excessive sentence in light of the totality of the circumstances. A ten year sentence from this Court is a significant sentence and unlike a mill run state sentence of the same quantity, would be served almost completely.

The other consideration of the application of the Sentencing Guidelines is the calculation of the proper offense level for methamphetamine. In the instance case that level is purported to be 32 based on a weight of 123 grams. The question then arises as to the basis for that determination by the Commission.

Were we to look at the 1987 Sentencing Guidelines Manual it would become quickly obvious that methamphetamine is conspicuous by its absence from the Drug Quantity Tables. [See, *United States Sentencing Commission, Guidelines Manual, October 1987*, pp. 2.38-2.39]. At that time, methamphetamine is listed under the Drug Equivalency Tables and is stated as equivalent to 2.0 grams of cocaine or 0.4 grams of heroine. [Id. p. 2.42] Using this conversion the 123 grams in this case would be 246 grams of cocaine under the 1987 Table and had an offense level of 20. Pursuant to the 1987 Sentencing Table a Category VI, Offense Level 20 required a

sentencing range of 70-87 months. This is the sentence range which was envisioned by the Supreme Court when it talked about the Commission's institutional role and determinations made on empirical findings. [See, *Kimbrough, Gall et al.*] The current guideline ranges and calculations are in response to Congressional mandates and thus, are not given the same institutional response. In *Spears*, 555 U.S.___(slip op at 4),

> The implication was that an "inside the heartland" departure (which is necessarily based on a policy disagreement with the Guidelines and necessarily disagrees on a "categorical basis") may be entitled to less respect. Our opinion said, however, that the "crack cocaine Guidelines . . . present no occasion for elaborative discussion of this matter because those Guidelines do not exemplify the Commission's exercise of its characteristic institutional role." 552 U. S., at ___ (slip op., at 21). *Kimbrough* thus holds that with respect to the crack cocaine Guidelines, a categorical disagreement with and variance from the Guidelines is not suspect.

That statement makes clear that when the Guideline does not arise from the Commission's characteristic institutional role, disagreement and variance by this Court is not suspect. Herein, the offense calculation results in a Guideline range which is 300% of the 1987 Guideline; 210 verses 70 months at the bottom of the respective ranges.

The relocation of methamphetamine from the Drug Equivalency Table to the

Drug Quantity Table occurred as a result of 1991 Congressional action and is reflected in Amendment 370. Today's guideline ranges result from additional Congressional action, in 1997, and are reflected in Amendment 555. As these changes are clearly not based on the Commission's "characteristic institutional role" they lack the requisite *bona fides*. Again in 2000, Congressional action resulted in Amendment 594 to "respond to statutory changes" by the Commission. The distance from the original guideline promulgation is clearly not the empirical work of the Commission but rather that of political or legislative influence.

Hence, the mandatory minimum of 120 months would appear to be the most reasonable sentence based upon the totality of the circumstances.

The Defendant

It is breathtaking to think that Jerry Cawood did not meet his mother until he was older. It is unimaginable to think of growing up with a mother who simply left shortly after our birth. That she made no contact or demonstrated any of the characteristics we are taught mothers innately have. To have a father who was in and out of prison and know that while he was in prison at least there would be no beatings or abuse. Jerry Cawood did have the care and love of his paternal grandfather but his death was untimely as it related to the nurture of Jerry.

His father returned to the scene and Jerry lived with him until his death from cancer. At this point he went to live with an uncle at least in a nominal way but in reality Jerry Cawood was on his own. Can anyone of us imagine trying to raise

ourselves, with apologies to former Secretary Rumsfeld, not knowing what it is we do not know making all of our unknowns unknown. A child fending in a world which is cold and uncaring.

In his own words,

> Hi. My name is Jerry Cawood I am 32. I was born in Stillwater, Oklahoma. When I was less than 2 years old my mother mother left us 4 kids in a trailer with no adult and left town. My grandparents found us when they came to pick us up for the weekend. My father was locked up off and on until he died. I can remember fearing him getting out. He thought I wasn't his kid so he used to beat me really bad. I remember my grandmother putting makeup on me to hide the marks from DHS and my school. Not having a normal family was different I used to wonder what it would be like to have a mom and dad who loved me. The other kids at school seemed so happy. Things were ok as long as my dad was locked up. It was a scary thought of him getting out. He finally got out for the last time. When I was about 12 he made me go live with him. And we moved all the way to Lawton. It become the worst time of my life there was no stopping him now only God could save me now. I remember the last timehe beat me it was so bad I could not go to school. And then out of nowhere he got cancer and died. At this point I lived with my uncle. An alcoholic and meth user. The positive thing was he taught me how to work like a man. The bad thing was he was a parinode

(paranoid) person so he used to think things that was not real. I went from one bad situation to another bad situation. All I wanted to do was move back to my grandmothers house where I knew I would be safe. I remember the last day I seen my uncle. He checked me out of school. We got in the truck and he said you gonna die I instantly got scared I knew my uncle was crazy he drove me out to the farm he had a shot gun in the truck. He had been awake for over a month. He thought I was a cop he was so parinod. We got to the farm we got out of the truck he stuck that shot gun in my mouth and told me to walk to the canun and out of know where my mother came pulling up. She got out of the car and my uncle said get him out of hear or I am going to kill him. So we left. I was 17 years old at this point. My mom husband said I could not live with them there was not enough room. So hear I am on my own trying to make it. I ended up on drugs. They made my life even worse. Sence then I have been using drugs as exsus (excuse) to kill the pain and to help forgot. For the first time in my life I have a loving relationship with my mother it's kinda like my new drug. This is the first time in my life that I have no desier (desire) to use drugs. I cant even stand to think about them. The out come of my disishen (decision) in my past has lead me to jail. So I have made a final disishen and that is to live by the lord. There is one thing that I what to know forshure and that is that I am going to Heaven. So I have made some changes in the way my mind

thinks. God Bless you. [Some spelling corrected or supplemented to aid clarity].

This was Jerry Cawood's reality. His life was a Dickensian novel, but there was no saving Tiny Tim in this story.

Jerry Cawood learned all of the wrong lessons. More precisely he failed to be taught the right lessons. Partly that is his fault and partly it is the fault of those who had the responsibility of insuring he became a valued member of society. There is still an opportunity at this late date to change what was into what can be. This offense has been very traumatic for him and he has great remorse. But it is not a belated conversion.

Jerry Cawood has tried previously to atone for his mistakes. The Government is aware of these efforts. The Government is aware that these efforts pre-date the filing of this case. The Government is aware of much in this case due to these efforts. These past attempts at atonement and self-rehabilitation are worthy considerations in determining the appropriate sentencing range in this case.

As stated above the requested sentencing range to be considered as reasonable fulfillment of the §3553(a) goals and objectives is the 120 months of the mandatory minimum. It would provide a just punishment for the offense, it is long enough to provide a deterrent to any future conduct and serve as a warning to others. It is reasonable in light of sentence disparity consideration. It is long enough to provide him with the necessary treatment and vocational needs which are clearly demonstrated. It is long enough without being more than necessary to achieve these

goals. There was no Cawood Drug Trafficking Organization, there was just Jerry Cawood "druggie". While this is not normally a resume' strong point, it was just what the Government needed for their endeavors. Mr. Cawood, with the best of intentions, has attempted to right his past and demonstrate his ability to be a productive citizen. He has not been fully successful in that pursuit, but he has not given up his continued attempt to attain such goal. Mr. Cawood's attempts at self-rehabilitation are noteworthy and of great value. This "bootstraps" attempt should be considered demonstrative of the respect for the law which is a sentencing consideration. As stated, he has had some "backsliding" but that should be expected from a person with no support system to help prevent such occurrence. Keeping sobriety is not an easy function even with a strong support system. This is not a new or unique fact. The famous Bill W. of Alcoholics Anonymous came to this conclusion in the 1930s. Jerry Cawood lacked even the rudimentary help of an AA type sponsor. This sort of attempt at rehabilitation is a valid consideration under the §3553(a) sentencing factors. Even if the Guideline would preclude such that preclusion is not binding on this Court. See, e.g. *Pepper v. United States*, 131 S. Ct. 1229 (2011) (remanding for resentencing because the court of appeals erred in "categorically precluding" the district court from exercising its discretion based upon policy disagreements, thereby failing to grant a downward variance based upon extensive evidence of the defendant's post sentencing rehabilitation) and *United States v. Simmons*, 568 F.3d 564 (5th Cir. 2009) (remanding for reconsideration because the district court erroneously believed that it could not disagree with the

guideline policy statement regarding age because "*Kimbrough* does not limit the relevance of a district court's policy disagreement with the Guidelines to the situations such as the cocaine disparity and whatever might be considered similar").

The Conclusion

Jerry Cawood, in consideration of the factors to be considered pursuant to §3553(a) moves this Court to enter a sentence in this case at or near the mandatory minimum ten years; such sentence meets or exceeds these statutory requirements without being more than necessary. That such a sentence would be fair and reasonable to the Government, the Defendant and sufficiently protective of society.

Respectfully Submitted,

S/ *William H. Campbell*
William H. Campbell OBA #1454
Attorney for Defendant Cawood
925 N.W. Sixth Street
Oklahoma City, Oklahoma 73106
(405) 232-2953
CampbellLawOffice@ionet.net

**Certificate of Service**

I hereby certify that on July 18, 2013, I electronically transmitted the attached document to the Clerk of the Court using the ECF system for filing and transmittal of a Notice of Electronic Filing to the all ECF, there are no non ECF registrants known.

S/ *William H. Campbell*
William H. Campbell